IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 77363-1-I |
| | ) | |
| Respondent, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| MOHAMED AWEYS MUSE, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | FILED: June 3, 2019 |

HAZELRIGG-HERNANDEZ, J. — Mohamed Aweys Muse appeals the judgment and sentence imposed following his jury conviction for possession with intent to manufacture or deliver alprazolam. He contends that prosecutorial misconduct, evidentiary error, and the trial court's prejudicial remarks deprived him of his right to a fair trial. While none of Muse's claims standing alone constitute reversible error, we conclude that the cumulative effect of these errors materially affected the outcome of the trial. Accordingly, we reverse his conviction.

## FACTS

On the afternoon of May 5, 2016, King County Sheriff's Office Detectives Matthew Volpe and Andrew Schwab were on patrol undercover on a King County Metro bus. The bus stopped at Airport Way South and South Holgate Street in Seattle. Detective Volpe described this area as home to a "prolific" amount of drug use and drug activity.

From inside the bus, Detective Volpe saw a man, later identified as Muse, standing at the bus stop. Detective Volpe saw a woman walk up to Muse and Muse pull a prescription bottle out of his pocket. The woman put her hand out, Muse dispensed something small into her hand, and the woman handed Muse some cash.

The detectives got off of the bus two stops later and began searching for the individuals involved in the transaction. They did not find the woman, but they located Muse a few blocks away. Detective Schwab approached Muse and asked "Do you have any pills?" Muse looked at Detective Schwab, paused for a few moments, and said no. Muse then ran across the street to catch an arriving southbound Metro bus.

The detectives instructed uniformed officers to board the bus and detain Muse. Following a consensual pat down search, officers found three prescription pill bottles in Muse's pants pockets. Muse's name was on all three bottles, but the pills inside did not match the labels. Instead, the bottles contained 105 pills of alprazolam, also known as Xanax. Detective Volpe confronted Muse with his observation that "these aren't the pills that are prescribed to you." Muse claimed he found the pills in his apartment parking lot and was using them to help him sleep. He denied selling them to the woman.

Detective Volpe arrested Muse. In a search incident to arrest, officers discovered approximately $612 in small denominations in Muse's pocket. Officers also discovered two prescription pill bottles in Muse's backpack. These bottles

contained epilepsy medications that were prescribed to Muse, and the labels were consistent with the medications contained therein.

The State charged Muse with one count of possession with intent to manufacture or deliver alprazolam. A jury convicted Muse as charged. Muse appeals.

## DISCUSSION

Muse alleges a number of errors related to statements made by the prosecutor, the State's witnesses or the judge. Specifically, Muse argues that (1) Detective Volpe violated the court's pre-trial ruling by testifying that Muse was taken to jail after his arrest; (2) Detective Volpe's testimony that he witnessed "a drug deal" constituted an impermissible opinion on Muse's guilt; (3) the judge erred in admitting duplicative and prejudicial photographs of Muse after his arrest; (4) the prosecutor improperly vouched for the credibility of police officers; (5) the prosecutor argued facts not in evidence by asserting that Muse was "taking advantage" of drug addicts; (6) the judge impermissibly commented on sentencing consequences during voir dire; and (7) the judge prejudiced Muse's defense by informing the jury he was represented by public defenders. Muse contends that these errors, either individually or cumulatively, deprived him of the right to a fair trial.

I.     Testimony that Muse was jailed after his arrest

Prior to trial, the court granted Muse's motion to exclude any evidence that he was jailed after his arrest. The court also ordered the parties to "specifically advise witnesses of all applicable pretrial rulings."

During direct examination, the prosecutor asked Detective Volpe why detectives searched Muse following his arrest:

[PROSECUTOR:] Why do you do that?
[DETECTIVE VOLPE:] Because then when they go to jail –
    [DEFENSE COUNSEL:] Objection, Your Honor. Relevance
    and pretrial motions.
    THE COURT: Yeah, why don't you move on from this
    question.

Shortly after this exchange, the prosecutor asked Detective Volpe if he had had any other involvement in the case. Detective Volpe responded that he helped another officer take photographs, filled out some paperwork, "and then we drove him to jail." Muse again objected. The court told the prosecutor "Next question, please."

After testimony ended for the day, Muse moved for a mistrial. The prosecutor stated that she "had given the detective a very lengthy list of things not to say . . . [h]e had a long list of things in his head that he wasn't supposed to talk about, so, you know, I—I don't believe that he did that intentionally." The court denied the motion, stating "I don't think it rises to level of mistrial, especially given the fact that apparently there's going to be a picture of him sitting on the sidewalk under arrest."[1] The court offered to give a curative instruction. Muse did not request one.

It is undisputed that Detective Volpe's testimony violated the court's pre-trial ruling.[2] The State has a duty to prepare its witnesses for trial, and a violation of a

---

[1] Muse does not challenge the court's denial of the mistrial.

[2] The court's ruling on the motion was somewhat equivocal. Muse moved to exclude any evidence that he was "handcuffed, arrested and jailed." The parties then discussed statements

4

pretrial order constitutes a serious trial irregularity. State v. Montgomery, 163 Wn.2d 577, 592, 183 P.3d 267 (2008); State v. Gamble, 168 Wn.2d 161, 178, 225 P.3d 973 (2010). An irregularity in trial proceedings is grounds for reversal when it is so prejudicial that it deprives the defendant of a fair trial. State v. Davenport, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984). In determining whether a trial irregularity deprived a defendant of a fair trial, this court examines the following factors: (1) the seriousness of the irregularity, (2) whether the statement in question was cumulative of other evidence properly admitted, and (3) whether the irregularity could be cured by an instruction to disregard the remark, an instruction which a jury is presumed to follow. State v. Escalona, 49 Wn. App. 251, 254, 742 P.2d 190 (1987) (citing State v. Weber, 99 Wn.2d 158, 165-66, 659 P.2d 1102 (1983)).

References to a defendant being in jail implicate the defendant's right to the presumption of innocence. State v. Mullin-Coston, 115 Wn. App. 679, 693, 64 P.3d 40 (2003). But such references are not automatically so prejudicial as to warrant a new trial. Standing alone, the testimony did not deprive Muse of a fair trial. Had this been the only error, a curative instruction to the jury could have cured the prejudice. But considered together with other similar errors in this case, as

---

Muse made during the booking process. The court stated "I think we can exclude evidence that he was jailed" but, immediately thereafter, stated "We need to address that after we decide whether . . . or not those statements are admissible. If they're not admissible—if it's not admissible, then that's the—probably the biggest thing to—I just—let's decide that first and then talk about this again . . . So, I'm going to reserve No. 3, and it entirely seems to depend on what I decide on the 3.5 and 3.6." There was no further discussion of the motion after the CrR 3.5 and 3.6 hearing. Nonetheless, we accept the State's concession that the testimony was improper.

discussed below, we cannot conclude that the violation had no effect on the verdict.

II.     Testimony that Detective Volpe witnessed "a drug deal"

After Detective Volpe testified as to what he witnessed between Muse and the unidentified woman, the prosecutor asked "[S]o, what—based on your experience as an officer, what did that indicate to you?" Detective Volpe responded "That was a drug deal."

Muse objected, contending "It draws a legal conclusion." The court overruled the objection. The prosecutor continued, asking Detective Volpe why he believed he had seen a drug deal. Detective Volpe responded:

> Because I saw Mr. Muse pour something into somebody's hand out
> of a prescription bottle, which is very common for pills to be in them
> and street drugs as well. It's very common people put street drugs in
> a prescription bottle. And then I saw her hand him money. In my—in
> my mind that's what it was.

Detective Volpe testified that this interaction was "consistent with the other narcotic transactions that [he had] observed." Muse renewed his objection, arguing that "this invades the territory of the jury." The court again overruled the objection.[3]

Generally, a police officer testifying as an expert is permitted to make reasonable inferences based on the evidence and the officer's training and experience. State v. Thein, 138 Wn.2d 133, 148, 977 P.2d 582 (1999) (citing State

---

[3] Muse also challenges Detective Volpe's later testimony that, after finding $612 in small bills in Muse's pockets, he told Muse "that, you know, when somebody has money that we believe is proceeds from drug sales, then we—we'll seize it." But Muse objected to this testimony on relevance grounds, not on the grounds that it was an impermissible comment on Muse's guilt. A party may assign evidentiary error on appeal only on a specific ground made at trial. State v. Kirkman, 159 Wn.2d 918, 926, 155 P.3d 125 (2007).

v. Graham, 130 Wn.2d 711, 725, 927 P.2d 227 (1996)). And ER 704 provides that "[t]estimony in the form of an opinion or inferences otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

However, "opinion testimony should be avoided if the information can be presented in such a way that the jury can draw its own conclusions." State v. Montgomery, 163 Wn.2d at 591. Opinion testimony by police officers may be especially prejudicial because it "often carries a special aura of reliability." Kirkman, 159 Wn.2d at 928. And opinions as to the defendant's guilt are improper under any circumstances. State v. Quaale, 182 Wn.2d 191, 199, 340 P.3d 213 (2014). Such testimony violates a defendant's constitutional right to a jury trial, which vests in the jury "'the ultimate power to weigh the evidence and determine the facts.'" Montgomery, 163 Wn.2d at 590 (quoting James v. Robeck, 79 Wn.2d 864, 869, 490 P.2d 878 (1971)). But "[t]he fact that an opinion encompassing ultimate factual issues supports the conclusion that the defendant is guilty does not make the testimony an improper opinion on guilt." City of Seattle v. Heatley, 70 Wn. App. 573, 579, 854 P.2d 658 (1993) (emphasis in original).

Citing Montgomery, Muse contends that the testimony expressed the detective's personal belief in his guilt. In Montgomery, the defendant was charged with possession of pseudoephedrine with intent to manufacture methamphetamine. At trial, the prosecutor asked whether a detective had formed conclusions based on his observation of the defendant buying pseudoephedrine. The detective testified "I felt very strongly that they were, in fact, buying ingredients

7

to manufacture methamphetamine based on what they had purchased, the manner in which they had done it, going from different stores, going to different checkout lanes. I'd seen those actions several times before." Montgomery, 163 Wn.2d at 587-88. The Washington Supreme Court held that the testimony constituted an improper opinion on the defendant's guilt, noting that the testimony involved "the core issue and the only disputed element, Montgomery's intent." Id. at 594. However, the court concluded that the testimony was not manifest constitutional error because the jurors were properly instructed that they were the "sole judges of [ ] credibility" and were not bound by expert witness opinions. Id. at 595.

Here, Detective Volpe's explanation that street drugs are frequently dealt out of prescription bottles was proper based on his training and experience. But the detective's testimony that what he witnessed was "a drug deal" was improper. At best, it invaded the province of the jury to draw its own conclusions from Muse's conduct. At worst, it was an improper opinion as to Muse's guilt, as in Montgomery, because the sole disputed issue was whether Muse possessed alprazolam with intent to deliver it. "[A] fact finder can reasonably infer that a defendant possessed a controlled substance with intent to deliver based on evidence that, before the arrest, he or she delivered a substance to another person." State v. Hernandez, 85 Wn. App. 672, 676, 935 P.2d 623 (1997).

As in Montgomery, the trial court properly instructed the jurors that they were required to "decide the case solely on the evidence and the law before you," and they were the "sole judges of the credibility of each witness." Absent evidence to the contrary, juries are presumed to have followed the instructions they are

given. State v. Stein, 144 Wn.2d 236, 247, 27 P.3d 184 (2001). Nonetheless, because testimony by police officers is particularly likely to influence a jury, we conclude that Detective Volpe's testimony, combined with the other errors in this case, likely affected the jury's verdict.

III.    Admission of photographs of Muse after his arrest

The State offered two photographs of Muse in order to refresh Detective Volpe's recollection about what Muse was wearing that day. The photographs are largely identical, showing Muse sitting on a curb with his hands behind his back and his head down. One photograph is taken from a slightly closer angle and shows more of Muse's face. No handcuffs are visible but it is clear from Muse's posture that he is restrained.

Muse objected, arguing that the photographs were duplicative and that they were more prejudicial than probative because they clearly showed him in handcuffs. The court overruled the objection and admitted both photographs.

> And I determined, because there's been a—a lot of testimony about him being in handcuffs taken off the bus, being searched, patted down, that the jury already I think clearly understands that he was under arrest at the time, and because, as I understand, the Defense theory to be Det. Volpe identified the wrong person. I think they are clearly more probative than prejudicial, so I'll—1 and 2 are admitted

Evidence is relevant when it has any tendency to make the existence of any consequential fact more probable or less probable than it would be without the evidence. However, even when relevant, evidence may nevertheless be excluded if its probative value is substantially outweighed by the likelihood that it will mislead the jury or promote a confusion of the issues. We review a trial court's evidentiary

9

decisions for abuse of discretion. State v. Finch, 137 Wn.2d 792, 810, 975 P.2d 967 (1999). The trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds. State v. Stenson, 132 Wn.2d 668, 701, 940 P.2d 1239 (1997)).

Muse asserts that the trial court abused its discretion in admitting the photographs because they had minimal probative value and prejudiced his constitutional right to the presumption of innocence. We agree with Muse that the photographs were not particularly probative. Because the State offered Muse's driver's license into evidence, the photographs were unnecessary to identify the defendant as Muse. The State contends that the photographs refute Muse's claim that he was not the man at the bus stop. But the photographs do not show that Muse was the person Detective Volpe saw at the bus stop. They show only that Muse was the person who was arrested, which was not in dispute. The State offers no justification for offering two essentially identical photographs.

However, the trial court's decision to admit the photographs was not unreasonable. As the State notes, both Detective Volpe and two other police officers had already testified that Muse was handcuffed after he was arrested. Muse did not object to this testimony. The photographs, despite showing Muse restrained, are not in any other way inflammatory. We do not conclude that the trial court abused its discretion in admitting the photographs.

IV. Argument that police officers are inherently trustworthy

In the State's closing argument, the prosecutor argued that the officers' testimony was more credible than Muse's.

10

So, why are those five detectives credible—or those four detectives that you heard testimony from? Those detectives were on duty that day. They were patrolling the bus lines, trying to reduce the crime rate along the Metro Transit routes. They're just doing their job. They told you they've never seen the Defendant before. They weren't out to get him that day. They just saw him engage in a drug deal, and then decided to go contact him. They were just doing their job. They have no stake in the outcome of this case.

Muse did not object to the prosecutor's statement.

In his closing argument, Muse challenged Detective Volpe's credibility and argued that the detective was lying so that the jury would convict him.

Why is Det. Volpe testifying to this, to something that didn't happen; that he probably couldn't have heard because he was far away and that he couldn't have seen because he was far away and facing the wrong direction? And the reason is that Det. Volpe is here to make Mr. Muse look like a drug dealer . . . This is his bread and butter. He knows what he's doing. He knows what it looks like. He knows how to testify and make someone look like a drug dealer. Maybe he heard that conversation on one of his other cases. But, that conversation didn't happen here. It didn't. And he's exaggerating his testimony to make this look like a drug dealer—to make Mr. Muse look like a drug dealer.

In rebuttal closing argument, the prosecutor responded to Muse's claim.

Defense got up here and really tried to convince you that Det. Volpe was just making everything up; that Det. Volpe was willing to risk his entire career on this one case. He was going to do everything he could to just exaggerate because this one case, this one drug deal that he saw in the course of the 500 others that he's seen, this case is worth risking his entire career. He was going to exaggerate that much. Ladies and gentlemen, that's not reasonable to assume.

Muse also did not object to these statements.

Muse contends that the prosecutor committed misconduct by arguing that police officers are inherently trustworthy and vouching for their credibility based on facts not in evidence.

11

"A claim of prosecutorial misconduct requires the defendant to show both that the prosecutor made improper statements and that those statements caused prejudice." State v. Lindsay, 180 Wn.2d 423, 440, 326 P.3d 125 (2014). "If the defendant objected at trial, the defendant must show that the prosecutor's misconduct resulted in prejudice that had a substantial likelihood of affecting the jury's verdict." State v. Emery, 174 Wn.2d 741, 760, 278 P.3d 653 (2012) (citing State v. Anderson, 153 Wn. App. 417, 427, 220 P.3d 1273 (2009)). If the defendant fails to object or request a curative instruction, the misconduct is waived unless an instruction could not have cured the resulting prejudice. Lindsay, 180 Wn.2d at 430 (citing State v. Stenson, 132 Wn.2d 668, 719, 940 P.2d 1239 (1997)). In evaluating a claim of prosecutorial misconduct, this court reviews a prosecutor's remarks "in the context of the total argument, the issues in the case, the evidence addressed in the argument, and the instructions given to the jury." State v. Brown, 132 Wn.2d 529, 561, 940 P.2d 546 (1997).

A prosecutor commits misconduct by personally vouching for the credibility of a witness. State v. Ish, 170 Wn.2d 189, 196, 241 P.3d 389 (2010). Improper vouching occurs when the prosecutor expresses a personal belief in a witness's credibility or refers to evidence not presented at trial to support a witness's testimony. Id. Prosecutors have some latitude to argue facts and inferences from the evidence. State v. Jones, 144 Wn. App. 284, 293, 183 P.3d 307 (2008). However, they are not permitted to make prejudicial statements unsupported by the record. Id. And it is improper for prosecutors to bolster a police witness's good

12

character even if the record supports such argument. Id., 293 (citing State v. Smith, 67 Wn. App. 838, 844-45, 841 P.2d 76 (1992)).

In Jones, the prosecutor argued that a confidential informant was credible because the police officers would not have risked their careers by using an unreliable informant.

> And how much sense does it make to you that Detective Elliott or any narcotics detective would put their own reputation on the line? Their own credibility? Their own integrity of their investigation? Their very livelihood on the line for one silly person who is duping or snookering them somehow?

Id. at 293. Division Two of this court held that the statements were improper because they bolstered the officer's character "by using facts not in evidence, namely that police . . . would suffer professional repercussions if they used an untrustworthy informant." Id. Federal courts have repeatedly held it is improper for a prosecutor to argue that an officer would not lie because to do so would risk his or her career or reputation, when no evidence in the record supports such an argument. See, e.g., U.S. v. Martinez, 981 F.2d 867, 871 (6th Cir.1992); U.S. v. Pungitore, 910 F.2d 1084, 1125 (3d Cir.1990); U.S. v. Swiatek, 819 F.2d 721, 731 (7th Cir.1987); U.S. v. Miller, 621 F.3d 723, 732 (8th Cir.2010).

The State asserts that the prosecutor's remarks in rebuttal were a fair response to Muse's argument that Detective Volpe was lying. But "the prosecution is not allowed to use improper tactics even in response to similar tactics by the defense." U.S. v. Sarkisian, 197 F.3d 966, 990 (9th Cir.1999). And, even if "'invited, provoked, or occasioned by defense counsel,'" a prosecutor may not respond with improper remarks if "'such remarks go beyond a pertinent reply and

bring before the jury extraneous matters not in the record, or are so prejudicial that an instruction would not cure them.'" State v. Davenport, 100 Wn.2d 757, 761, 675 P.2d 1213 (1984) (emphasis omitted) (quoting State v. La Porte, 58 Wn.2d 816, 822, 365 P.2d 24 (1961)).

The State was entitled to respond when Muse challenged Detective Volpe's credibility. But it was not permitted to do so based on facts not in evidence. When, as here, the State's case hinges entirely on the credibility of its witnesses, improper vouching is particularly prejudicial to the defense. Given the other errors in this case, we cannot say with confidence that a curative instruction would have sufficiently cured the prejudice.

V.    Arguing jury should convict Muse because he preyed on drug addicts

Detective Volpe testified that there was a methadone clinic "[a]bout a block, half a block" from the bus stop where he saw Muse. He testified:

> In my experience the methadone clinics attract a lot of people that have drug addiction issues. And people that want to – want to make money will go down to those areas and make money.

Muse objected to the testimony on relevance grounds. The trial court overruled the objection.

The State's theory of the case was that Muse loitered near the bus stop in order to sell alprazolam to individuals visiting the methadone clinic. The State began its closing argument as follows:

> Taking advantage of an addiction. Taking advantage and seizing an opportunity to make some money off of someone whose addiction won't let them say no. Taking advantage and seizing an opportunity. On May 5th, 2016, the Defendant, Mohamed Muse, saw an opportunity. He saw an opportunity to make a few bucks off of

14

someone else's addiction. He hung around downtown in an area near a methadone clinic flooded with addicts and waited for opportunity to arise. And it did.

Muse argues that the State's argument was based on facts not in evidence. He contends that there was no testimony about the identity of the woman to whom Muse sold the alprazolam, and no evidence that Muse "hung around" near the methadone clinic.

It was not improper for the State to argue that people who sell drugs are likely to sell them in areas where a large number of people suffer from drug addiction. This was a reasonable inference from the evidence. But the State did not present evidence that Muse frequently sold drugs near the methadone clinic. An argument made at the beginning of the State's closing argument has a particular capacity for prejudice because it serves "as a prism through which the jury should view the evidence." State v. Ramos, 164 Wn. App. 327, 340, 263 P.3d 1268 (2011). There was a substantial likelihood that the State's characterization of Muse, based on facts not in evidence, impermissibly affected the jury's verdict.

VI.     Comments on sentencing consequences during voir dire

During jury selection, the prosecutor asked if any potential jurors had "a problem with criminalizing drug possession and drug dealing." Several potential jurors volunteered that they did, particularly with respect to lengthy sentences for nonviolent drug offenses. The prosecutor asked "if you were to be told by the Judge that you as jurors have nothing to do with the punishment, would you be able to make a decision as to whether or not somebody did something on a

particular day?" After potential jurors weighed in on that question, Juror 13 challenged the premise that the jury had nothing to do with punishment:

> And I also thought your question about like that was a little bit of a not so great question we had where you basically were, like, hey, so, like, you're not deciding the punishment, can you still be objective? Well, yeah, technically we're not deciding the punishment, right? We're—technically we're not saying, oh, you're going to be in jail for a year, but in reality, that's going to be the implication of what we decide. Uhm, especially with, like, drug use, which I believe have essentially, like, mandated sentences. So, if you say the person is guilty, they're going to get a certain number of years in prison, so.

The trial court interjected "That's not an accurate statement, but, no."

Juror 13 insisted "[W]e do basically [inaudible] determine what the punishment is." The trial court responded:

> The question I think really for all of you is you all may have feelings, do you agree or disagree with the drug laws, in this case specifically about whether or not he possessed with the intent to deal prescription drugs. The question is whether you can follow the law as I give it to you. So, that's my question, and let me just ask you, Juror 13, do you think you can follow the law or do you feel like you have such strong feelings about the drug laws that you probably— you're not sure you can follow the law, or you can't follow the law?

Juror 13 admitted that he would probably not follow the law, stating "I have a lot of . . . biases."

Following the end of voir dire, Muse asked to strike the entire jury panel based on the trial court's statements to Juror 13.

> I do have some concerns about how this voir dire was conducted. I'm concerned about the appearance of fairness. Juror No. 13 did talk about there being sentencing ranges for drug cases, and you stepped in to correct him and tell him that is wrong. I'm not sure that that's an accurate statement of the law, and I feel like that was not appropriate to be giving them that information. Jurors have all sorts of incorrect ideas, and choosing to jump in at that point, I am concerned about the bias that that projects to the jury.

16

The court denied the motion.

> Okay. The motion is denied. Mandatory drug laws usually refer to the Rockefeller drug laws, which are [inaudible] Washington state for a long time, but that's not really the issue. The issue is whether or not he's giving information that he believes in—in a way, so I was—I didn't tell him what was right, but I simply told him that was not the case.

Muse argues that the trial court erred in commenting on sentencing because it "unnecessarily and improperly minimized the punishment Mr. Muse would face." In support of this claim, Muse cites to State v. Townsend, 142 Wn.2d 838, 15 P.3d 145 (2001). In Townsend, the defendant was charged with first degree murder. The trial court, at the prosecutor's request, informed the jury that "[t]his is not a case in which the death penalty is involved and will not be a consideration for the jury." Id. at 842. The Washington Supreme Court held that "the jury in a noncapital case may not be informed about the penalty for the charged crime." Id. at 846. The court reasoned "[t]his strict prohibition against informing the jury of sentencing considerations ensures impartial juries and prevents unfair influence on a jury's deliberations." Id.

The facts of Townsend are distinguishable. Townsend prohibits informing the jury about the specific penalty for the charged crime. Here, the trial court did not inform the jury about the sentence Muse would face if convicted. Instead, the trial court informed the jury that Juror 13's description of the sentencing process was inaccurate.

Nonetheless, "'[i]t is well established that when a jury has no sentencing function, it should be admonished to reach its verdict without regard to what

sentence might be imposed.'" Id. at 846 (internal quotation marks omitted) (quoting Shannon v. U.S., 512 U.S. 573, 579, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994)); see also State v. Hicks, 163 Wn.2d 477, 487, 181 P.3d 831 (2008) ("[I]n response to any mention of capital punishment, the trial judge should state generally that the jury is not to consider sentencing.") While the trial court's statement to Juror 13 was a correct statement of the law, the appropriate course is to preclude discussion of sentencing consequences during voir dire.

VII.    Informing the jury that Muse was represented by public defenders

As the trial court gave some standard introductory remarks to the jury pool, it admonished potential jurors to not discuss the case with anyone.

> So, what happens when we learn that that's happened? Well, the trial has to restart. We have to start all over again. And who pays for that restarting of the trial? Well, you do. You pay my salary. You pay the salary of the clerk and the bailiff who are seated before you, Mr. Roberts and Ms. Gillum, and, in fact, in this case you're also paying the salary of the lawyers. So, please do not discuss this case with anyone until the end of trial.

The trial court then proceeded to ask the jury pool if they knew anyone involved in the case.

> Does anyone know Ms. Anderson, who is the Prosecutor seated before you? Does anyone know anyone who works for the King County Prosecutor's Office? Does anyone know anyone who works for a prosecuting attorney agency [inaudible]? No. 24 and 25, thank you.
> Does anyone know Ms. Scheinman or Ms. Aitken, who are seated here before you, representing Mr. Muse. Does anyone know any lawyers who work for the King County Department of Public Defense? 3.

Muse objected to the trial court's remarks. He argued that he was entitled to a new jury panel.

I am concerned about Your Honor twice referring to us as—well , once calling us public defenders by saying that the County is paying our—or the taxpayers are paying our bills, or our salaries, as well as asking if anyone worked where we worked, which is the King County Department of Public Defense. I know that there are a lot of biases about being public defenders. Many of our clients and other people as well consider us public pretenders. And I think that injects also bias into this.

The trial court denied the request, stating "[I]n every case, I have to ask—I'm required to ask whether somebody knows someone or works for the agency or the law firm [inaudible], so that's a question asked in every case."

Muse contends that the trial court's remarks improperly alerted the jury that he was represented by court-appointed counsel. He contends that he was prejudiced because "'[j]urors may have perceptions of public defenders as less skilled or less likely to represent innocent people." Remarkably, no Washington case appears to discuss the prejudice involved in referring to a defendant's attorney as a public defender.[4] But it is without question that it would be improper for a prosecutor to highlight a defendant's indigency by doing so. Muse's concerns regarding jurors' perceptions are not unreasonable. The trial court's characterization of Muse's attorneys as public defenders carried the risk of prejudice and should be avoided.

---

[4] The two Washington cases upon which Muse relies are inapposite. In State v. Kennard, 101 Wn. App. 533, 541, 6 P.3d 38 (2000), involving a defendant charged with robbery, the trial court admitted evidence of the defendant's bankruptcy proceedings. We recognized that "poor financial condition may be highly prejudicial standing alone because the inference that poverty leads to crime is impermissible," but nevertheless held that the evidence was relevant to establish a motive for committing the robberies. State v. Gonzalez, 129 Wn. App. 895, 899, 120 P.3d 645 (2005), involved a trial court's remark that the defendant "had not been able to bail out." Division Three of this court held that the defendant was prejudiced by this remark because it denied the defendant the presumption of innocence, not because it implied the defendant lacked financial resources.

It is well settled that a defendant "is entitled to a trial free from prejudicial error, not one that is totally error free." State v. Evans, 96 Wn.2d 1, 5, 633 P.2d 83 (1981). But cumulative error may so prejudice a defendant's right to a fair trial as to merit reversal. In re Pers. Restraint of Yates, 177 Wn.2d 1, 65-66, 296 P.3d 872 (2013). Here, the State's evidence against Muse was substantial. But much of the State's case rested on the credibility of Detective Volpe and the other officers. A number of errors either improperly bolstered the credibility of the State's witnesses or undermined the presumption of innocence. Accordingly, we cannot conclude that Muse received a fundamentally fair trial.[5]

We reverse his conviction.

WE CONCUR:

_____

_____ Chun, J.        _____ Mann, A.C.J

---

[5] Given our resolution of the case, we do not address Muse's claim that the trial court erred in denying his request for an exceptional sentence below the standard range.